IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

EDITH L. YOUNCE,            )
                                    )
           Plaintiff,        )
                                    )
         v.               )     Case No.
                                    )     15-0016-CV-W-REL-SSA
CAROLYN W. COLVIN, Acting    )
Commissioner of Social Security,   )
                                    )
           Defendant.    )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Edith Younce seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that (1) she is unable to work due to heart problems, and (2) the ALJ erred in determining that her carpal tunnel syndrome is not a medically determinable impairment. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On May 10, 2011, plaintiff applied for disability benefits alleging that she had been disabled since January 6, 2007. Plaintiff's disability stems from heart problems and carpal tunnel syndrome. Plaintiff's application was denied on July 28, 2011. On October 18, 2012, a hearing was held before an Administrative Law Judge. Additional medical evidence, additional vocational evidence, and comments from plaintiff's counsel were submitted after the hearing. The additional vocational evidence was

submitted to plaintiff's treatment provider, Mark Vogt, D.O., at plaintiff's request; however, Dr. Vogt did not respond. On July 19, 2013, the ALJ found that plaintiff was not under a "disability" as defined in the Act. Plaintiff submitted additional medical evidence to the Appeals Council. On November 4, 2014, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

2

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These

regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential

evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and

is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of
impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Cindy

Tounger, in addition to documentary evidence admitted at the hearing and presented to

the Appeals Council.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

4

**Earnings Record**

The record shows that plaintiff earned the following income from 1986 through 2012:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1986 | $ 1,465.00 | 2000 | $ 12,903.51 |
| 1987 | 0.00 | 2001 | 5,437.15 |
| 1988 | 0.00 | 2002 | 0.00 |
| 1989 | 0.00 | 2003 | 0.00 |
| 1990 | 0.00 | 2004 | 0.00 |
| 1991 | 288.19 | 2005 | 2,948.19 |
| 1992 | 0.00 | 2006 | 19,155.25 |
| 1993 | 0.00 | 2007 | 24,273.89 |
| 1994 | 0.00 | 2008 | 0.00 |
| 1995 | 0.00 | 2009 | 0.00 |
| 1996 | 205.60 | 2010 | 0.00 |
| 1997 | 6,358.95 | 2011 | 0.00 |
| 1998 | 6,216.33 | 2012 | 0.00 |
| 1999 | 11,879.30 | | |

(Tr. at 185, 192).

**Function Report**

In a Function Report dated May 27, 2011, plaintiff indicated that she gets up and makes her bed, showers, eats, and goes to her husband's house to help with the kids

5

(Tr. at 220-227).  "I am constantly with family members because I still have dizzy, cloudy feelings."  Plaintiff and her husband adopted two of their grandchildren, and plaintiff helps with their "learning, dressing, etc."  Plaintiff has no problems with personal care.  She prepares her own meals daily for 10 to 30 minutes with frequent rests. Plaintiff is able to separate clothes and load the washer.  Bending over and then straightening back up makes her lightheaded.  Plaintiff takes walks with her grandchildren, she reads and watches television.  She shops in stores once or twice a month for 30 to 60 minutes at a time.

Plaintiff's impairments affect her ability to lift, squat, bend and reach.  Her impairments do not affect her ability to stand, walk, sit, kneel, climb stairs, use her hands, remember, complete tasks, concentrate, understand, follow instructions, or get along with others, except sitting hurts her back after 30 to 60 minutes (Tr. at 225).

## B.    SUMMARY OF TESTIMONY

During the October 18, 2012, hearing, plaintiff testified; and Cindy Tounger, a vocational expert, testified via interrogatories at the request of the ALJ.

## 1.    Plaintiff's testimony.

At the time of the hearing plaintiff was 53 years of age (Tr. at 84).  She stopped working in November 2007, even though her alleged onset date is January 6, 2007 (Tr. at 84).  Plaintiff had been working as a truck driver, a career she began in June or July of 2005 (Tr. at 84).  She worked for three different companies as a truck driver (Tr. at 84).

Before working as a truck driver, plaintiff tried to do many things (Tr. at 85). No one would hire her, not even Wal-Mart, because she was unable to stock the shelves -- she cannot reach over her head (Tr. at 84-85). Her left arm has nerve damage, and in 1999 or 2000 some doctor at Olathe Medical Center told her not to lift that arm above her head (Tr. at 85). Plaintiff worked at Rival's from 1996 to 2000 and has had trouble with her arms since then (Tr. at 85-86).

Plaintiff stopped working in November 2007 because she fell off a truck and landed on her face -- the fall was caused by dizziness (Tr. at 86). This occurred at a rest stop in Pennsylvania (Tr. at 86). Plaintiff did not seek medical attention at the time (Tr. at 86). The day after the fall, the right side of her face was bruised and she had blood in her eye (Tr. at 86). When she got home from that trip, she decided that driving a truck was not worth taking that risk again (Tr. at 86).

Plaintiff was having dizziness because of the circulation in her body (Tr. at 86). She first had heart problems in January 2007 -- she was parked at a truck stop in Davenport, Iowa, and she got up at 6:00 a.m. to call her husband to wake him up so he could get their kids off to school (Tr. at 86). She started having chest pain and knew was what going on because her father had had heart trouble (Tr. at 86-87). She told her co-driver that she was having a heart attack and to call 911 (Tr. at 87). Because of that heart attack, plaintiff was not permitted to drive a truck from January until March (Tr. at 87). In March 2007, she convinced the doctor that she was feeling better, so the doctor released her to go back to work (Tr. at 87). But when she got on the truck, the truck bothered her heart a lot (Tr. at 87). She was tired a lot, and when she was driving

7

she could feel her heart fluttering (Tr. at 87).  She continued working from March 2007 until November 2007 when she fell out of the truck due to the dizziness (Tr. at 87).  She had been getting dizzy a lot before that, but she wanted to keep her job so she just "took it slow" (Tr. at 87).

Since she quit driving a truck, plaintiff has tried to get other jobs (Tr. at 87).  Wal-Mart will not hire her because she is unable to stock shelves "and that's where they put you at first." (Tr. at 87).  Plaintiff would not be able to do a job that required sitting most of the day with no driving or moving around because her legs go to sleep and she gets knots in them all the time (Tr. at 87-88).  Her doctor said not to worry about it, that it is not related to blood clots (Tr. at 88).  But she has knots in her legs that make her feet and legs go to sleep a lot (Tr. at 88).  She also has pain in her neck, back, arms and hands (Tr. at 88).  Her pain is "all over" (Tr. at 88).  Her doctors have not provided any treatment for this pain (Tr. at 88).  One doctor told her to take Ibuprofen (which did help her pain), but her cardiologist told her not to because it would thin her blood (Tr. at 88).  He told her to take Tylenol, but it does not work (Tr. at 88).  There are no further surgeries that can be done to help plaintiff's arms and hands (Tr. at 89).

Plaintiff throws up almost every morning because of gastroesophageal reflux disease ("GERD") (Tr. at 89).  She has told her doctor about it but he has kept her on the same medications (Tr. at 89).  If she takes an over-the-counter medication for GERD, she feels better about a half hour later (Tr. at 89).

Plaintiff has headaches daily due to a blood thinner she is taking (Tr. at 89).  Dr. Vogt, her primary care physician, told her this medication would give her headaches

8

(Tr. at 90). Plaintiff's daily headaches are a 7 out of 10 in severity (Tr. at 90). Plaintiff's medications also cause nausea and vomiting (Tr. at 92). When she passes bile, she feels better (Tr. at 92).

Plaintiff began having memory problems after her last heart attack on April 30, 2011 (Tr. at 90-91). She is also depressed because she has seven grandchildren and cannot do much with them because of her condition (Tr. at 91). She has not been treated for depression although she has told her doctors about it (Tr. at 91). Her doctors have told her to go to Pathways for treatment but she does not want to do that because it will be on her records and her grandchildren may see it, so she is trying to deal with it on her own (Tr. at 92). She has been depressed since she quit work because she has always worked,[1] and she had plans for the money (Tr. at 92).

Plaintiff can sit for 30 minutes at a time and then she needs to stand (Tr. at 93). She lives with her mother and her mother's boyfriend, and plaintiff tries to keep the house up because her mother works caring for the elderly (Tr. at 93, 96). Plaintiff does the dishes but sometimes has to sit down two or three times before she is finished (Tr. at 93). She can only stand to do dishes for 5 to 10 minutes at a time, then she has to sit down for 5 or 10 minutes to catch her breath (Tr. at 93). She gets out of breath easily when she walks (Tr. at 93). Walking and standing do not cause pain (Tr. at 93-94). Plaintiff can walk about a city block before she is out of breath (Tr. at 94). She tried to carry a 10-pound bag of potatoes the day before the hearing but her mother had

---

[1]Plaintiff's earnings record shows an average annual income of $3,184 per year for the 21 years before 2007 when she alleges that she became disabled. Additionally, of that 21 years, she had no income at all during 11 years.

to take it from her because her hands were not gripping properly (Tr. at 94). Plaintiff

tries to carry things for her mother, even though lifting causes pain in her wrists and

hands (Tr. at 94-95). After she carries something, her pain will usually go away if she

moves her hands around, but sometimes she has to take Tylenol (Tr. at 95).

Plaintiff has trouble bending -- she had an accident when she was younger and

now if she bends over for more than 15 or 20 minutes a knot the size of a fist comes up

and bothers her (Tr. at 95). She also has trouble straightening back up (Tr. at 95). If

she bends over to get something off the floor, she will get dizzy (Tr. at 96).

Plaintiff does not have any trouble with personal care; however, once she fell out

of the shower and banged the side of her face on the toilet and her chest was bruised

(Tr. at 97). As a result, her mother asks her to leave the bathroom door unlocked when

she showers (Tr. at 97). Plaintiff bruises easily because of her blood thinners (Tr. at

97).

Plaintiff is capable of cooking and does sometimes, but her mother does most of

the cooking because she is better at it (Tr. at 97). Plaintiff and her mother both do the

laundry (Tr. at 97). Plaintiff does the clothes, and her mother does the sheets and

blankets because plaintiff is not able to get them off the beds (Tr. at 97-98).

On a typical day plaintiff will do things for her mother and then go outside and sit

on the porch and drink coffee (Tr. at 99). When her mother gets home from work, they

do things together (Tr. at 99). Plaintiff's mother likes to square dance, and plaintiff will

go along and watch her mother dance (Tr. at 99). Plaintiff goes out once or twice a

week for an hour and a half to two hours at a time to watch her mother dance (Tr. at

99). Plaintiff takes two or three naps during the day, each for a half hour or maybe more (Tr. at 99-100).

Plaintiff continues to smoke (Tr. at 100). Her mother does not allow smoking in the house, so plaintiff has cut down (Tr. at 100). Plaintiff moved in with her mother in March of 2012 (Tr. at 100). Before that she lived in a house with her husband and two of her grandchildren, ages 10 and 11, whom plaintiff and her husband adopted (Tr. at 100). Plaintiff's husband is disabled (Tr. at 101). The two kids still live with him and plaintiff spends a lot of time there helping him and the kids, but she and her husband do not get along well anymore (Tr. at 101). Although plaintiff's husband is disabled due to leg problems, he does most of the driving and plaintiff only drives when necessary (Tr. at 101). She is afraid she will have a heart attack and does not want to "take somebody else out." (Tr. at 101). During the past week plaintiff spent about four nights with her husband and the rest of the time at her mother's house (Tr. at 101). Plaintiff's son and his wife and three kids are also staying with plaintiff's husband, which makes the house crowded, so plaintiff likes to spend time at her mother's house (Tr. at 102). When she is at her husband's house, she helps the kids with their homework and she does some cooking (Tr. at 102). The children living there are 11, 10, 5, 4, and 4 (Tr. at 102).

## 2. Vocational expert testimony.

Vocational expert Cindy Tounger submitted completed interrogatories on March 15, 2013 (Tr. at 164-167, 270-273). Plaintiff's past relevant work consists of truck driver, DOT 904.383-010, semi-skilled with a light to medium exertional level; and small

11

products assembler, DOT 706.684-022, unskilled with an SVP of 2 and performed at the light exertional level (Tr. at 164).

The hypothetical involved a person who could perform light work except the person could sit for 5 hours at a time and for a total of 6 hours per day; stand for 3 hours at a time and for a total of 5 hours per day; and walk 1 hour at a time for a total of 2 hours per day (Tr. at 165). The vocational expert testified that such a person could perform the small products assembler position as performed by plaintiff and as normally performed in the economy. The person could also perform the job of truck driver as performed by plaintiff (Tr. at 165). The position of truck driver as it is performed in the national economy exceeds the lifting limit of this residual functional capacity (Tr. at 165). The hypothetical person could also perform the following jobs: office helper, DOT 239.567-010, light, unskilled, with 2,500 jobs in Missouri and 60,000 in the country; marker, DOT 209.587-034, light, unskilled, with 2,050 in Missouri and 92,415 in the country; or sub assembler of electrical equipment, DOT 729.684-054, light, unskilled, with 1,390 in Missouri and 69,500 in the country (Tr. at 166).

On June 4, 2013, Ms. Younger submitted answers to supplementary interrogatories (Tr. at 280-284, 307-310). This hypothetical was the same as from the previous set of interrogatories except the person could only occasionally climb, balance, stoop, kneel, crouch or crawl. Ms. Younger testified that such a person could still perform the work of a small products assembler as that job is performed in the national economy (Tr. at 281). The hypothetical person could not perform the small products assembler position as performed by plaintiff in her past relevant work because plaintiff

Case 4:15-cv-00016-REL   Document 16   Filed 08/05/16   Page 12 of 33

said she was required to stoop 7 hours per day (Tr. at 281). The hypothetical person could not work as a truck driver (Tr. at 281). The hypothetical person could also perform the jobs of office helper, marker, and sub assembler of electrical equipment, as reflected in the original hypothetical (Tr. at 282).

## C.   SUMMARY OF MEDICAL RECORDS

Plaintiff's alleged onset date is January 6, 2007. On that day plaintiff awoke with mid sternal chest burning and jaw discomfort. She went to the emergency room and underwent an emergency cardiac catheterization[2] with angioplasty[3] and a drug-eluting stent.[4] Blockage was reduced to zero and she had normal blood flow. Plaintiff remained a patient at Genesis Medical Center in Davenport, Iowa, through her discharge on January 10, 2007 (Tr. at 311-318). While discussing her past medical history, plaintiff reported having previously had surgery for bilateral carpal tunnel syndrome (Tr. at 313). She reported taking over-the-counter medication as needed for

---

[2]Cardiac catheterization is a procedure used to diagnose and treat cardiovascular conditions. During cardiac catheterization, a long thin tube called a catheter is inserted in an artery or vein in the patient's groin, neck, or arm and threaded through the blood vessels to the heart. Using this catheter, doctors can then do diagnostic tests as part of a cardiac catheterization.
http://www.mayoclinic.org/tests-procedures/cardiac-catheterization/home/ovc-20202754

[3]Angioplasty uses imaging guidance to insert a balloon-tipped catheter into a narrow or blocked blood vessel where the balloon is inflated to open the vessel and improve blood flow. It may be done with vascular stenting -- the placement of a small wire mesh tube within the blood vessel to help keep it open.

[4]Drug-eluting stents have a polymer coating over mesh that emits a drug over time to help keep the blockage from recurring.

Case 4:15-cv-00016-REL   Document 16   Filed 08/05/16   Page 13 of 33

indigestion which had been present over the past several months (Tr. at 313-314). On exam her musculoskeletal exam was normal; extremities were normal (Tr. at 314).

Plaintiff reported smoking a pack of cigarettes per day for the past 35 years (Tr. at 314). Smoking cessation was discussed at length, and plaintiff was told to adhere to a low fat diet. Plaintiff's overall cholesterol, LDL cholesterol, and triglycerides were high, and she was prescribed Plavix, Lopressor, Lipitor, and aspirin (Tr. at 312). Plaintiff was told to have a fasting lipid profile done in six weeks, and to follow up with a cardiologist within the next month (Tr. at 312). On discharge her ejection fraction[5] was normal at 55% and there was "no heart failure or arrhythmia at this time." (Tr. at 315).

On February 13, 2007, plaintiff saw Mark Vogt, D.O., as a new patient (Tr. at 686-687). She reported that her Lipitor seemed to be causing flank pain and she had discontinued it as a result. Plaintiff reported smoking a pack of cigarettes per day. Dr. Vogt noted that plaintiff appeared well. He adjusted her medication and told her to return in two months.

On March 13, 2007, plaintiff saw Dr. Vogt to go over results of lab work (Tr. at 684-685, 691). Her triglycerides, LDL cholesterol and VLDL cholesterol were all high.

_____

[5]Ejection fraction is a measurement of the percentage of blood leaving the heart each time it contracts. During each heartbeat pumping cycle, the heart contracts and relaxes. When the heart contracts, it ejects blood from the two pumping chambers (ventricles). When the heart relaxes, the ventricles refill with blood. No matter how forceful the contraction, it never is able to pump all of the blood out of a ventricle. The term "ejection fraction" refers to the percentage of blood that is pumped out of a filled ventricle with each heartbeat. The left ventricle is the heart's main pumping chamber that pumps oxygenated blood through the ascending (upward) aorta to the rest of the body, so ejection fraction is usually measured only in the left ventricle ("LV"). An LV ejection fraction of 55 percent or higher is considered normal.
http://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286

Plaintiff said she wanted to return to work but needed to be cleared to return after her heart attack. Dr. Vogt noted that plaintiff appeared well. He told her to return in three months for a lipid panel.

On March 19, 2007, plaintiff underwent a chemical stress test (Tr. at 665-666, 694-695). Her left ventricle ejection fraction was normal at 67%.

On March 27, 2007, Edward MacInerney, Jr., M.D., a cardiologist, wrote a letter to Mark Vogt, D.O., plaintiff's primary care physician, regarding the chemical stress test she had recently undergone (Tr. at 696). "The stress imaging procedure was performed to clear her to return to work (required by the US Department of Transportation). As you are aware, the study suggested normal LV function. . . . Based on Edith's status as detailed in my consult of 02-22-07, and based on the report of the stress imaging, Edith is clear from my standpoint to return to work as a truck driver. No further cardiovascular testing is warranted at this time."

On June 8, 2007, plaintiff saw Dr. Vogt to go over her lipid panel (Tr. at 682-683, 690). She was experiencing fatigue and a dry cough. He noted that she appeared well. Her coronary artery disease was noted to be stable. Her overall cholesterol, LDL cholesterol, VLDL cholesterol, and triglycerides were all high.

On August 3, 2007, plaintiff saw Dr. Vogt to go over lab results (Tr. at 680-681). "Appears well."

On October 5, 2007, plaintiff saw Dr. Vogt for results of lab work (Tr. at 678-679). "Appears well."

Plaintiff stopped working in November 2007.

On May 3, 2008 -- seven months after her last doctor visit -- plaintiff was seen by Mary Sweet, M.D., for complaints of right flank and abdominal pain (Tr. at 659). Plaintiff reported a history of kidney stones six to seven years ago (Tr. at 660). Plaintiff continued to smoke (Tr. at 658, 663). On exam her extremities were noted to be non-tender with normal range of motion and no pedal edema (Tr. at 663). She was assessed with acute urinary tract infection and given antibiotics (Tr. at 663).

About seven months later, on October 29, 2008, plaintiff saw Mark Vogt, D.O., complaining of bruising easily (Tr. at 676-677). "Has knots in her legs if grand kids stand on her legs. She has their footprints on legs. . . . She has several grand kids and plays with them a lot and, apparently, she lies down on the floor and they stand on her, or something like that and, as a result, she ends up with a lot of bruising." Plaintiff's physical exam was normal except some mild bruising. She was diagnosed with coronary artery disease. "We discussed maybe taking the Plavix back a little bit, maybe just taking it five times a week. She is almost two years out from her stents. She may not need the Plavix but she is afraid to go off of it, but I told her that is what is probably causing her bruising and that is going to be the tradeoff."

One year later, on October 30, 2009, plaintiff was seen by Mark Vogt, D.O., complaining of "a little bit of cough and sinus drainage for three weeks" (Tr. at 673). Plaintiff denied chest pain and musculoskeletal pain. Her physical exam was normal, including her extremities. She was diagnosed with upper respiratory infection which "seems to be resolving."

Ten months later, on August 23, 2010, plaintiff had a chest x-ray due to complaints of chest pain for the past two days (Tr. at 636, 641). Kenneth Jones, D.O., observed atherosclerotic vascular disease.[6] Plaintiff reported pain in her back between her shoulder blades, along with anxiety (Tr. at 648). She had been extremely anxious with "too many stressors lately in her life". Her daughter-in-law died about two months earlier, causing plaintiff to have difficulty sleeping due to the stress (Tr. at 643). She stated that her current symptoms were different than the symptoms she experienced in 2007 when she had a heart attack. Plaintiff continued to smoke (Tr. at 642, 648). On exam her extremities were normal with normal range of motion and no edema (Tr. at 643). She was assessed with chest wall pain (Tr. at 649). Plaintiff was told to stop smoking, use Tylenol or Ibuprofen for pain, and follow up with Dr. Vogt within the week (Tr. at 649).

Three months later, on November 29, 2010, at approximately 9:00 p.m., plaintiff was seen in the emergency room after having experienced chest discomfort and jaw pain while cooking (Tr. at 628-634). She was diagnosed with pericardial chest pain (Tr. at 634). The following day plaintiff saw Mark Vogt, D.O., who approved her discharge (Tr. at 621-622). Plaintiff reported that her chest discomfort and jaw pain resolved quickly in the emergency room after taking an aspirin. "Her cardiac workup done there was all negative, but they thought she should be admitted at least overnight for observation. Other than the stents in 2007, she has been relatively healthy. She had a

---

[6]Atherosclerotic vascular disease refers to the buildup of fats, cholesterol and other substances in and on the artery walls, which can restrict blood flow.

17

daughter-in-law die about three or four months [ago].  It has created a lot of additional stress, and she attributes some of her symptoms to this additional stress."  Plaintiff was taking Plavix, Vytorin, Metoprolol, and aspirin.  She continued to smoke a pack of cigarettes per day.  On exam, plaintiff's extremities were noted to be normal.  Dr. Vogt approved plaintiff's discharge.

On December 2, 2010, plaintiff had a chemical stress test (Tr. at 704-705).  Her ejection fraction was normal at 72%.  There was no significant change in this test as compared to the one done on March 19, 2007.

On December 6, 2010, plaintiff saw Mark Vogt, D.O., for a follow up on her hospital stay (Tr. at 702).  "She is doing better."  She reported a little bit of chest pain but chewed up an aspirin and felt much better after that.  Plaintiff reported feeling good this day.  Her LDL cholesterol, VLDL cholesterol and triglycerides were all high (Tr. at 703).  Dr. Vogt noted that her coronary artery disease was stable and he refilled her Metoprolol.  Plaintiff did not seek medical care over the next five months.

At 5:00 a.m. on April 30, 2011, plaintiff went to the emergency room complaining of chest pain for the past two hours (Tr. at 335, 606-619).  She had been at the computer when the pain began, she became short of breath and vomited (Tr. at 398, 412).  In the ER her blood pressure was 127/77 (Tr. at 397, 612).  Her ejection fraction was normal at 72% (Tr. at 619).  Plaintiff's diagnosis was STEMI, or ST-elevation myocardial infarction (Tr. at 390, 415, 616).  This is a heart attack caused by sudden complete blockage of a coronary artery.  Plaintiff was admitted to St. Joseph Medical Center  (Tr. at 335-603).  On exam her extremities were noted to be non-tender with

18

normal range of motion and no pedal edema (Tr. at 390). Her grip strength was strong

bilaterally, and her leg strength was strong bilaterally (Tr. at 453, 457, 467, 468). She

reported that she was a current smoker and had been smoking for 40 years (Tr. at 399,

413, 451). She had been on a normal (not heart healthy) diet (Tr. at 458). Although

she reported experiencing dizziness on April 29, 2011 (Tr. at 595), she repeatedly

denied dizziness or vertigo throughout her hospital stay (Tr. at 461, 463, 464, 591, 592).

Plaintiff's total cholesterol was 187 (normal), her LDL cholesterol was high at 119

(should be less than 70), her triglycerides were 140 (normal), and her ejection fraction

was 65% (normal) (Tr. at 387). On May 1, 2011, she complained of hernia pain and

reported a history of hiatal hernia[7] (Tr. at 599). Although plaintiff had some chest pain

this day, she declined nitroglycerin as it gave her a bad headache, and lying on her

right side relieved the chest discomfort (Tr. at 603).

On the morning of May 2, 2011, plaintiff had no chest pain, no shortness of

breath (Tr. at 432). Her main complaint was right upper chest/shoulder ache (Tr. at

431).

---

[7]"A hiatal hernia occurs when part of your stomach pushes upward through your
diaphragm. Your diaphragm normally has a small opening (hiatus) through which your
food tube (esophagus) passes on its way to connect to your stomach. The stomach
can push up through this opening and cause a hiatal hernia. In most cases, a small
hiatal hernia doesn't cause problems, and you may never know you have a hiatal hernia
unless your doctor discovers it when checking for another condition. But a large hiatal
hernia can allow food and acid to back up into your esophagus, leading to heartburn.
Self-care measures or medications can usually relieve these symptoms, although a
very large hiatal hernia sometimes requires surgery."
http://www.mayoclinic.org/diseases-conditions/hiatal-hernia/basics/definition/con-20030
640

On the morning of May 3, 2011, plaintiff had no chest pain, no shortness of breath (Tr. at 431). Her main complaint was right shoulder pain which she attributed to a previous fracture (Tr. at 431, 599). She was given hydrocodone and a hot pack which relieved her shoulder pain (Tr. at 599, 602). By the afternoon of May 3, 2011, plaintiff's shoulder pain was relieved by Ibuprofen and a warm pack (Tr. at 603). She did experience some nausea but was treated with Phenergan (Tr. at 598). She was able to walk around the hospital unit twice which she tolerated well (Tr. at 599). She met with a case manager this day.

> Pt evaluated for d/c [discharge] planning needs based on high risk screen. Reviewed chart and spoke with nurse plt and pt's spouse. Pt lives in Lowry City in house with spouse. Pt was independent with ADL's [activities of daily living] prior to admission. Pt had been employed as a truck driver. Pt said she has not been able to work after her first heart attack, but has not applied for Social Security disability. Pt said she completed application for Medicaid during this hospitalization. Spoke with financial aid counselor and she will follow up with Medicaid Application. Pt given information re: completing SS disability application.

(Tr. at 598, 601).

By the morning of May 4, 2011, plaintiff stated that she felt much better (Tr. at 430). She had no chest pain and no shortness of breath (Tr. at 430). Her shoulder pain was treated with scheduled Ibuprofen, and she was permitted hydrocodone as needed (Tr. at 603). Plaintiff was discharged on May 4, 2011, with instructions not to lift over 10 pounds for two weeks; continue eating a low fat, low cholesterol, low salt diet; and stop smoking (Tr. at 417, 597, 706-707). She was given a prescription for Chantix to help her stop smoking (Tr. at 430). She stated that she would quit "cold turkey" (Tr. at 594) but did not sign a smoking cessation contract (Tr. at 596). Regarding activity

20

precautions, the discharge instructions state, "allow for rest as needed." (Tr. at 336).

Plaintiff's cardiac records state that she had a heart attack caused by atherosclerosis,

or clogging of the arteries (Tr. at 387). "The treatment for your condition is medical

management." Plaintiff was told to eat a heart-healthy diet, stay active with exercise

and activities, quit smoking, and take her medication as directed (Tr. at 388, 417, 594).

On May 11, 2011, plaintiff saw Mark Vogt, D.O., complaining of "a little bit of

edema in her hands, feet and legs, and some rib and feet pain." Plaintiff had recently

been discharged from the hospital. Dr. Vogt told plaintiff that her "little bit of lower

extremity pain and just a little bit of edema" should resolve. He assessed coronary

artery disease and told her to return in three months for a lipid panel.

On June 21, 2011, plaintiff saw John Holkins, M.D., for a cardiology consult (Tr.

at 715-716). "Since discharge, she denies any chest, neck, jaw or arm discomfort to

suggest recurrent angina. She denies undue dyspnea with moderate activity. She

unfortunately has continued to smoke cigarettes. . . . Since discharge, she has done

well from a clinical perspective." Dr. Holkins indicated he planned to continue plaintiff

on her current medication regimen with no changes and to see her back in six months.

On December 8, 2011, plaintiff had a chemical stress test (Tr. at 736-737).

On January 3, 2012, plaintiff saw John Holkins, M.D., for a cardiology follow up

(Tr. at 732-733). Plaintiff reported right upper quadrant discomfort radiating up into the

right shoulder for the past few days. She also reported some acid reflux symptoms.

Her episodes most often occurred during the night and typically lasted only a few

minutes. "When she has the acid peptic symptoms, there is, at times, nausea and

vomiting." Plaintiff reported continuing to smoke approximately 5 cigarettes per day. Plaintiff reported having drank coffee prior to her stress test in December which Dr. Holkins noted "may invalidate the pharmacologic stress test result." Dr. Holkins prescribed Imdur (an Isosorbide mononitrate, prevents chest pain) and Prilosec (for stomach acid) and told her to return in two weeks.

On January 17, 2012, plaintiff saw John Holkins, M.D., for a cardiology follow up (Tr. at 730-731). Plaintiff complained of recent central chest discomfort "which has been improved by the addition of Isosorbide mononitrate," improved reflux symptoms after the addition of Prilosec, and some right upper quadrant pain which was suspicious for gallbladder disease. "There is certainly nothing to suggest that this is of cardiac etiology." Dr. Holkins continued plaintiff on her same medications and told her to return in six months.

On June 13, 2012, plaintiff had an upper GI endoscopy due to complaints of severe reflux with some intermittent nausea and vomiting (Tr. at 726-727). Plaintiff was assessed with gastritis[8] and hiatal hernia with mild reflux with esophagitis.[9]

On July 13, 2012, plaintiff had a chemical stress test (Tr. at 723). Her ejection fraction was normal at 87%. "The Lexiscan Cardiolite stress test demonstrates low probability for myocardial ischemia."[10]

---

[8]Inflammation of the stomach lining.

[9]Inflammation of the esophagus.

[10]Myocardial ischemia occurs when blood flow to the heart is reduced, preventing it from receiving enough oxygen. The reduced blood flow is usually the result of a partial or complete blockage of the heart's arteries (coronary arteries). Myocardial ischemia,

On July 17, 2012, plaintiff saw Jenny Pearson, a nurse practitioner, for a cardiology follow up (Tr. at 719-721). Plaintiff reported occasional episodes of chest discomfort that "occur more at rest than with activity." She had no associated shortness of breath. The episodes last for 1 to 2 seconds and resolve spontaneously. "She does have occasional light headedness with quick position change, which resolves in a matter of seconds." Plaintiff's physical exam was normal. She was continued on her same medications and told to follow up in six months.

On December 1, 2012, plaintiff saw Dennis Velez, M.D., for a consultative exam in connection with her disability case (Tr. at 740-745). Plaintiff reported only being able to walk one aisle in a Wal-Mart before getting short of breath, and she also needed to lean on her cart. Plaintiff continued to smoke. Plaintiff reported a history of finger and hand problems, but "denies weakness or difficulty using her hands." Plaintiff reported a several-year history of back pain and said it was getting worse and radiating down her left leg and causing cramping in both her legs. Her pain was worse when walking and bending. Plaintiff reported having had bilateral carpal tunnel surgery, bilateral arm surgery, and right thumb trigger surgery in 1999 and 2000.

During a review of systems, plaintiff reported night sweats, rash, itching, headaches, lightheadedness, vision changes, muscle pain, joint swelling, redness or heat of muscles or joints, limitation of motion, weakness, chest pain, shortness of breath on exertion, edema, hypertension, leg pains when walking, difficulties with

_____

also called cardiac ischemia, can damage the heart muscle, reducing its ability to pump efficiently.

memory, emotional problems, shortness of breath, cough, abdominal pain, heartburn, nausea, vomiting and diarrhea. Plaintiff said she could only sit for 20 to 30 minutes, stand for 5 to 20 minutes, walk for 1/2 to 1 block, lift 5 to 10 pounds repetitively and lift 15 to 20 pounds occasionally. She also reported functional limitations in seeing.

Plaintiff's blood pressure was 102/88. She appeared to be short of breath. She had decreased breath sounds but no evidence of wheezing. Her extremities had no edema; her skin had no rash. She was able to recall both remote and recent historical events. Her gait was normal, stance was normal. She had full strength in all of her extremities. Straight leg raise was negative. She had negative Phalen and Tinel signs (tests to detect carpal tunnel syndrome) and negative shoulder abduction test. She had slight tenderness to palpation in the right forearm area around a ganglion cyst. Her hands and fingers were normal. She was able to bend over and touch her toes, walk on her heels and toes, walk in tandem, squat and rise from a squatting position with ease.

In addition to performing the exam, Dr. Velez reviewed plaintiff's medical records. Dr. Velez indicated that he was not able to obtain any type of evidence from any of her records that may account for her allegation of difficulty using her hands. "She demonstrated intact hand grip and had no deformities in her hands or fingers and otherwise normal range of motion." Plaintiff had normal range of motion in her back as well as normal motor sensory findings. There was nothing to suggest any type of

radiculopathy or mechanical back pain or neurogenic claudication.[11]

> Based on the claimant's statements today, the history obtained, the findings on clinical examination as well as the review of the available and pertinent medical records, I could not find that this claimant would have any limitations as far as sitting or standing. She may have problems walking more than two-thirds of the time due to shortness of breath . . . . She, however, would not have any problems with manipulation, verbal or written communication problems, [but] may have problems doing lifting and carrying repetitively at least two-third of the time for the reasons listed above including shortness of breath on exertion.

That same day, Dr. Velez completed a Medical Source Statement (Tr. at 750-755). He found that plaintiff could lift up to 20 pounds occasionally; sit for 6 hours per day and for 5 hours at a time; stand for 5 hours per day and for 3 hours at a time; walk for 2 hours per day and for 1 hour at a time; continuously reach in any direction, handle, finger, feel, push or pull with either hand; and continuously operate foot controls with either foot. She is able to perform activities like shopping; travel without a companion; ambulate unassisted; walk at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare simple meals; care for her personal hygiene; and sort, handle or use papers and files.

---

[11]"Claudication is pain caused by too little blood flow, usually during exercise. Sometimes called intermittent claudication, this condition generally affects the blood vessels in the legs, but claudication can affect the arms, too. At first, you'll probably notice the pain only when you're exercising, but as claudication worsens, the pain may affect you even when you're at rest. Although it's sometimes considered a disease, claudication is technically a symptom of a disease. Most often, claudication is a symptom of peripheral artery disease, a potentially serious but treatable circulation problem in which the vessels that supply blood flow to your legs or arms are narrowed." http://www.mayoclinic.org/diseases-conditions/claudication/basics/definition/con-20033581

The following evidence was submitted to the Appeals Council.

On March 20, 2014, plaintiff saw John Holkins, M.D., at the Golden Valley Cardiology Clinic (Tr. at 8-56).

> She was seen last in cardiology clinic in 07/2012 with no modifications made at that time.  She contacted the office recently indicating she had been having recurrent chest pain.  In talking with her further, she describes one significant episode occurring yesterday. . . .  The patient states that she has been noticing recurrent chest discomfort episodes occurring 10-15 times over the last month.  These may occur with exertion.  She develops back pain when standing up [at] the sink and trying to cook or do dishes.  She is utilizing sublingual nitroglycerin fairly often.  The patient does state that she had discontinued medications at the end of last year for approximately 3 months due to cost.  She did resume these medications in 01/2014.

(Tr. at 28).  Plaintiff reported general malaise and fatigue.  An EKG on this day showed evidence of inferolateral infarct[12] with new T-wave inversion different from prior EKGs.  "[W]e have elected to proceed with a repeat cardiac catheterization."  Plaintiff's hypertension was noted to be well controlled on current medications.  "[S]moking cessation has been discussed at length and recommended.  She plans to begin use of e-cigarettes in hopes of complete smoking cessation." (Tr. at 29).  That same day plaintiff underwent a left heart catheterization with stent[13] placement, performed by Dr. Holkins (Tr. at 8-56).  Progress notes from the following morning, March 21, 2014, show that plaintiff denied chest pain or shortness of air.  Plaintiff was discharged on March 21, 2014.

-----

[12]Heart attack caused by sudden complete blockage of a coronary artery.

[13]Plaintiff had a drug-eluting stent placement, which is placement of a stent that slowly releases a drug to block cell proliferation.

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Alison K. Brookins entered her opinion on July 19, 2013 (Tr. at 63-78).  Plaintiff's last insured date was September 30, 2009 (Tr. at 65).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date of January 6, 2007 (Tr. at 65).  Plaintiff returned to work from April 2007 through November 2007 and her earnings record showed $24,273.89 in 2007; however, "it is unclear what income was received for January 2007 and if any income was received for short-term or other disability payments."  The ALJ noted that although plaintiff likely continued to perform substantial gainful activity, the case would be decided on the medical determination (Tr. at 66).

Step two.  Plaintiff has the following severe impairments:  coronary artery disease status post myocardial infarction and stent placement and persistent shortness of breath (Tr. at 66).  Although plaintiff's obesity is a non-severe impairment, its effects on plaintiff's coronary artery disease were considered in assessing her residual functional capacity (Tr. at 66).

History of hiatal hernia and mild reflux esophagitis are non-severe impairments (Tr. at 66).  Plaintiff reported nausea and vomiting only intermittently and infrequently and those symptoms were associated with episodes of severe chest pain rather than reflux or digestive issues (Tr. at 66).  Plaintiff indicated that her symptoms improved after adding Prilosec to her medications, she did not report particularly serious or frequent symptoms related to these conditions, and there is no evidence to suggest ongoing functional limitations were present (Tr. at 66).

27

Plaintiff's hypertension is non-severe as it is controlled on medication and there is no evidence it results in any symptoms or functional limitations (Tr. at 66-67).

Plaintiff's headaches are non-severe because there is no evidence of migraines or related medication management, and there is no indication her headaches occur with sufficient frequency or severity to support ongoing functional limitations (Tr. at 67).

Plaintiff alleged hand and finger problems during the hearing; however, her tests were all normal and there are no objective findings to support these allegations (Tr. at 67). Therefore, this alleged impairment is not medically determinable (Tr. at 67).

Plaintiff alleged during the hearing and during a consultative exam that she suffers from back pain with radiation to her legs (Tr. at 67). Plaintiff did not report this pain to any medical provider, and her consultative exam indicated normal range of motion with no signs of any difficulty sitting, standing or walking due to back pain (Tr. at 67). She had full strength in her extremities with no atrophy and normal testing, and there are no objective findings indicating any back impairment (Tr. at 67). A mild convexity (curvature) of the thoracic spine does not correspond to her complaints of low back pain (Tr. at 67). Therefore, this condition is not medically determinable (Tr. at 67).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 67-68).

Step four. Plaintiff retains the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently; she can stand 5 hours per day and for 3 hours at a time; she can walk 2 hours per day and for 1 hour at a time; she can sit for 6 hours per day and for 5 hours at a time; she can push or pull the same weights as she can lift;

Case 4:15-cv-00016-REL   Document 16   Filed 08/05/16   Page 28 of 33

and she can occasionally climb, balance, stoop, kneel, crouch or crawl (Tr. at 68). With this residual functional capacity, plaintiff is capable of performing her past relevant work as a small products assembler as generally performed, but not as actually performed due to plaintiff's allegation that her position required 7 hours of stooping (Tr. at 72).

Step five. In addition, plaintiff is capable of performing other jobs available in significant numbers, such as office helper, marker, and subassembler (Tr. at 72, 74).

Therefore, plaintiff is not disabled (Tr. at 74).

## VI. CARPAL TUNNEL SYNDROME

Plaintiff argues that the ALJ erred in finding that plaintiff's carpal tunnel syndrome is not a medically determinable impairment.

An impairment is "non-severe" if it has no more than a minimal impact on an individual's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a) and 416.921(a); SSR 96-3p. "Basic work activities" include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. 20 C.F.R. §§ 404.1521(b)(1) and 416.921(b)(1). "Symptoms . . . will not be found to affect an individual's ability to do basic work activities unless the individual first establishes by objective medical evidence (i.e., signs and laboratory findings) that he or she has a medically determinable physical or mental impairment(s)." SSR 96-3p.

Testing for carpal tunnel syndrome was done by Dr. Velez on December 1, 2012, and the tests were negative.

On May 11, 2011, a couple of days after plaintiff was discharged from the hospital, she told Vogt she was having "a little bit of edema in her hands." Dr. Vogt told

her that should resolve, and because plaintiff never raised that issue again it presumably did resolve. Later that month when plaintiff completed her administrative paperwork in connection with her application for disability benefits, she stated that her impairments do not affect her ability to use her hands. When being examined by Dr. Velez in connection with her disability case, she reported a history of finger and hand problems but denied weakness or difficulty using her hands. Plaintiff never complained to any doctor of difficulty using her hands, wrists or fingers, and all of her testing has been normal. Therefore, substantial evidence in the record supports the ALJ's finding that plaintiff's alleged hand and finger problems are not medically determinable and therefore not severe.

## VII.    HEART PROBLEMS

Plaintiff argues that she is disabled because she has heart problems. However, she fails to point out any error by the ALJ. Plaintiff simply states that because she has had heart issues in the past, she cannot work.

> . . . [W]hen claimant sustained the heart attack in January of 2007, she was taken to Genesis Medical Center in Davenport, Iowa, and was hospitalized for two days. . . . While there she underwent angioplasty, and deployment of a drug-eluting stent. She was then started on heart medications. . . .
>
> She was then subsequently seen at Golden Valley Medical Center in Clinton, Missouri, on December 2, 2010, for evaluation of a myocardial contusion chest pain. She has previously been admitted to Golden Valley Memorial Hospital on November 29, 2010, for observation relating to her coronary artery disease, she was again seen on several occasions by Dr. Vogt in Clinton, Missouri, concerning her heart. Those records are found in Exhibit 4F.
>
> Then on April 30, 2011, Claimant was admitted to the St. Joseph Medical Center in Kansas City, Missouri, with chest pains, related to her coronary artery

Case 4:15-cv-00016-REL   Document 16   Filed 08/05/16   Page 30 of 33

disease.  She was discharged on May 4, 2011.  Those records are marked Exhibit 3F, and contained at page 331 of the transcript.

In a letter from Carondelet Heart Institute, Dr. John M. Holkins, relative to her admission of April 30, 2011, stated that she had a heart ailment caused by atherosclerosis or clogging of the arteries.  She was treated and released on May 4, 2011.

(Plaintiff's brief, p. 2-3).

The mere fact that plaintiff has been treated for a heart condition does not mean that she is disabled.  The ALJ found plaintiff's testimony not credible.  Plaintiff does not contest this finding, and without further comment I note that the record clearly supports the ALJ's credibility determination.

Plaintiff was released to return to work as a truck driver, by a cardiologist, just a couple of months after her heart attack in 2007.  The cardiologist did not impose any functional restrictions.  Plaintiff did indeed work until November 2007 (even though her alleged onset date is in January 2007).  She claims that she stopped working in November after she became dizzy and fell out of her truck.  However, plaintiff drove the truck from Pennsylvania to Missouri after that fall, she did not seek medical attention either due to her alleged dizziness or due to injuries from the fall, and in fact she did not see any doctor for any reason for six months after she stopped working.  Although plaintiff claims that her dizziness was disabling in November 2007, she went six months with no medical care, and on her next appointment saw a doctor for a urinary tract infection, not for dizziness or cardiac problems.  A year after she stopped working, she saw a doctor for easy bruising, caused by medication that her doctor recommended she reduce as he suspected she no longer needed it.  Two years after she stopped working,

she saw a doctor for an upper respiratory infection, not because of dizziness or cardiac problems. Two years and ten months after she stopped working, she saw a doctor for chest pain associated with the stress of losing her daughter-in-law. It was not until three years after plaintiff stopped driving a truck, and nearly four years after her alleged onset date, that plaintiff sought medical care for a cardiac issue. She was kept overnight for observation then, was seen in follow up a month or so later (when she reported only a little bit of chest pain), and then went another five months with no need for medical care.

The next time plaintiff saw a doctor was at the end of April 2011 -- nearly 4 1/2 years after her alleged onset date. At that time, she had been smoking for 40 years despite having been told by multiple doctors for years to stop. She had been on a normal diet instead of a low fat, low cholesterol, low salt heart-health diet as recommended by her doctors. Although she reported having experienced dizziness on April 29 (the day before her hospitalization), she consistently denied dizziness during her five-day hospital stay. Two months later, cardiologist Dr. Holkins noted that plaintiff was doing well from a clinical perspective. During the next couple of years, Dr. Holkins kept plaintiff's medication management the same. She was only seen in follow up approximately every seven months. The records from March 2014 which were provided to the Appeals Council state that plaintiff went one year and eight months without needing to see her cardiologist.

No treating physician ever limited plaintiff's physical activities due to her cardiac condition. In fact, she was routinely told to exercise. Plaintiff's primary care physician,

Dr. Vogt, was provided with vocational evidence and asked to provide an opinion, and he declined. Dr. Velez prepared a Medical Source Statement on which the ALJ relied heavily, and it does not conflict with any of plaintiff's treatment records.

Failure to follow a prescribed course of treatment without justification is grounds for denying disability benefits. 20 C.F.R. § 404.1530; <u>Bernard v. Colvin</u>, 774 F.3d 482, 488 (8th Cir. 2014). Not only did plaintiff fail to exercise as recommended, she continued to smoke, she did not adhere to the recommended diet, and in late 2013 she went three months without taking her prescribed medication, allegedly due to cost although she continued to finance her smoking habit.

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's residual functional capacity determination, and her findings that plaintiff can perform her past relevant work and other work available in significant numbers.

## VIII. CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 5, 2016

33